## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| v. | ) | CRIMINAL NO. 98-00056-CB |
| | | CIVIL ACTION NO. 04-0042-CB |
| MARCUS SANDERS, | ) | |
| Defendant/Petitioner. | ) | |

### OPINION and ORDER

This matter is before the Court on a motion to vacate, set aside or correct sentence and a motion to amend the motion to vacate, set aside or correct sentence.  (Docs. 510 & 531.)  Both motions were filed by counsel on behalf of petitioner Marcus Sanders, a person in federal custody.  The government has filed responses in opposition to both motions. (Docs. 521 & 535.) In addition, both parties have submitted additional affidavits as required by the Court's order dated October 2, 2007.  (Doc. 539.)  After considering all of petitioner's claims and the government's response in light of the evidence and documents on filed, the Court finds that petitioner is not entitled to relief.

### FACTS

**Events Giving Rise to Murder Indictment**

Petitioner Marcus Sanders was initially indicted in the Southern District of Alabama in Criminal Number 95-00176 for his involvement in 1997 drug conspiracy.  Sanders went to trial on those charges and was acquitted in April 1998.  Before he could be released after his acquittal, Sanders was arrested on an information filed in this district charging him with a 1996 drug conspiracy.  An indictment was subsequently returned charging Sanders and several codefendants with conspiracy to possess with intent to distribute cocaine, possession of cocaine

with intent to distribute and attempt to possess cocaine with intent to distribute (collectively referred to as "the 1996 conspiracy"). In January 1999, Sanders and two codefendants, Robert "Sonny" Gibson, Sr. and Jacqueline Peransi, went to trial on the 1996 conspiracy. Gibson and Peransi were convicted on some counts, but the jury was unable to reach a verdict on any of the charges against Sanders. The Court declared a mistrial as to Sanders, set the case for retrial, and released Sanders on bond with electronic monitoring. Sanders returned to his home in the Detroit, Michigan area.

Sanders returned to court for jury selection on April 5, 1999. At jury selection, the government read a list of its potential witnesses, one of whom was Sonny Gibson. After his conviction, Gibson had agreed to testify on behalf of the government and was released pending sentencing. Because the trial itself was not scheduled to commence until April 19, 1999, Sanders returned to Michigan following jury selection.[1] On Saturday, April 17, 1999, Sonny Gibson was shot and killed at a gas station in Oak Park, Michigan. On Monday, April 19, 1999, Marcus Sanders failed to appear for trial, and a bench warrant was issued for his arrest.

**Murder Indictment and Trial**

On July 31, 1999, after several months as a fugitive, Sanders was captured in Michigan. He was returned to the Southern District of Alabama for further proceedings, and in August 1999 a federal grand jury in this district issued a superseding indictment, charging Sanders with two

---

[1]Sanders' electronic monitoring bracelet had been removed in order for him to travel to Alabama for jury selection. Upon his return to Detroit, Sanders failed to report to his pretrial services officer to have the bracelet reattached.

counts of murder[2] in addition to the charges arising from the 1996 drug conspiracy.  One of

Sanders' friends, Leslie Kelly, was also charged with murder as an aider or abettor. The United

States Attorney filed a notice of intent to seek the death penalty against Sanders.  Attorneys

Richard Morgan of Detroit and Dennis Knizley of Mobile, who had represented Sanders in both

previous trials, were appointed to represent Sanders on the capital murder charges.  Local

attorney Gordon Armstrong was also appointed to assist with the defense.

Sanders' capital murder trial commenced  on July 10, 2000.[3]  At trial, the government

presented the following evidence. At approximately 12:30 p.m. on April 17, 1999, Sonny Gibson

was pumping gas at a busy gas station/convenience store in broad daylight when a black Cadillac

Escalade drove up next to him.  The driver of the Escalade shot Gibson in the head and drove

away slowly.  Several people witnessed the shooting.  One of them, Jerry Hamilton, a customer

who was inside the convenience store, was able to provide a detailed description of the shooter

to a police artist.[4]  The resulting sketch bore a striking resemblance to Marcus Sanders.

Hamilton subsequently identified Marcus Sanders from a photo lineup and also testified at trial

that Sanders was the shooter.  In addition, several witnesses described the shooter as a black

---

[2]Sanders was charged with murder to prevent the testimony of a witness in violation of
18 U.S.C. § 1111 and 18 U.S.C. § 1512(a)(1)(A) and murder in retaliation for providing
information to a law enforcement officer regarding a federal offense in violation of 18 U.S.C. §
1111 and 18 U.S.C. § 1513(a)(1)(B).

[3]The drug charges and the murder charges against Sanders were severed for trial, and
Sanders eventually pled guilty to the drug charges.   Also, the murder trials of Sanders and Kelly
were severed.  Sanders went to trial first, and Kelly subsequently entered a guilty plea to murder.

[4]Hamilton had been a reluctant witness.  He left the convenience store before the police
arrived and gave a statement only after someone else had told the police that he and his children
had witnessed the shooting.

male and the vehicle as a black Escalade.  A few days before the shooting, Detroit police had

stopped a black Escalade driven by Marcus Sanders.[5]  Around 1:00 p.m. on the day of the

murder, codefendant Leslie Kelly took a black Escalade to a car wash near the scene of the

shooting and left it be detailed.[6]  Later that day, Marcus Sanders called a friend and had her pick

up the Escalade from the car wash.

The government also presented evidence that Sanders knew Gibson was cooperating with

the government and was not happy about it.  Vicki Gibson, the victim's daughter, testified  that

Sanders had telephoned Sonny Gibson's house in February 1999.  Vicki Gibson answered the

telephone and spoke with Sanders at that time.  Sanders told her that he knew her father was

going to testify and that he had read the statement her father gave to the police.  Sanders told

Vicki Gibson that her father should not testify.  There was also testimony from Baurilio Darius

regarding a threat Sanders made about Sonny Gibson.  Darius, a friend of Jackie Peransi, had

attended the January 1999 trial of Sanders, Peransi and Gibson.  Darius became friendly with

Sanders' girlfriend, Toni Yancey, who also attended the trial.  Darius, who lived in Miami, kept

in touch with Yancey regarding the ongoing legal proceedings.[7]  In March 1999, Sanders

answered the telephone when Darius called.  When Darius mentioned that Gibson was going to

testify against Sanders, Sanders threatened to kill Gibson, saying he would put a bullet in

Gibson's head.

---

[5]Although Sanders had gave a false name at the time, the officer who made the stop
identified Sanders as the driver.

[6]The black Escalade was registered to Michael Tait, the nephew of Toni Yancey,
Sanders' girlfriend/common law wife..

[7]According to Darius, Yancey had promised to send money to assist with Peransi's
appeal.

Defense counsel's strategy at trial was to cast doubt on the government's evidence.[8]  In cross examining Hamilton, the defense pointed out that Hamilton and his family were receiving money from the government as part of the witness protection program.  The defense also brought in witnesses, who either witnessed the shooting or saw the shooter in the area.  These witnesses could not identify Sanders and disagreed with the sketch artist's rendering of the shooter.  One of them was certain that Sanders was not the shooter.  Hamilton's school-aged sons–also witnesses to the shooting–were called to testify on behalf of the defense.  Defense counsel demonstrated that the boys had vacillated in their statements and were unable to identify Sanders as the shooter.  The defense was also able to point out  weaknesses in the government's evidence regarding Sanders' threats. For instance, as the daughter of the victim, Vicki Gibson naturally harbored some bias.  Also, Braulio Darius–the witness who testified about an overt threat--had never even met Sanders when Sanders made a threat to kill a witness during their first telephone conversation.

The jury deliberated for approximately 6 hours before announcing they were deadlocked. Because the hour was late, the Court sent the jurors home for the weekend.  When they returned on Monday morning, the Court gave them a modified Allen charge.  Later that day the jury reached a unanimous verdict, finding Sanders guilty as to both murder counts.  At the sentencing phase, the jury rejected the death penalty and returned the only other sentence possible--life imprisonment.[9]

**Events at Trial Relevant to § 2255 Claims**

---

[8]Sanders elected not to testify in his own defense.

[9]Sanders later pled guilty to the 1996 drug conspiracy charges.

**Absence of Toni Yancey's Testimony**

Toni Yancey, Marcus Sanders' live-in girlfriend and mother of his young child, was sometimes referred to as Sanders' common-law wife.  In preparation for trial, the defense filed a notice of alibi defense, identifying Ms. Yancey as a possible alibi witness.  The first notice stated that Ms. Yancey was with Sanders at a Detroit mall at the time of the shooting.  An amended notice was filed on April 19, 2000 stating that Sanders was at home with Ms. Yancey in West Bloomfield, Michigan at the time of the shooting and that they went together to the mall later that afternoon.  Despite the notice of alibi defense, Ms. Yancey did not testify at trial.

In his affidavit submitted in support of the § 2255 motion, Sanders does not address why counsel failed to call Ms. Yancey.  He states that he "demanded that both of my defense attorneys call Ms. Toni Yancey as my alibi witness at trial. . . . [,] [but] [b]oth of my attorneys refused to call Ms. Toni Yancey as an alibi witness in my defense at trial." (Sanders' Aff., Doc. 511, ¶¶ 13-14.)  In his affidavit, Mr. Knizley recalled that the defense made a collective decision not to call Ms. Yancey for strategic reasons and that Sanders took part in that decision. According to Mr. Knizley, the defense felt that calling a weak alibi witness–*i.e.*, a biased witness for whom there was no corroboration–could undermine their attack on the credibility of the eyewitness identification testimony.  Mr. Knizley states that  "[c]ollectively a decision was made not to call Mrs. Yancey.  Mr. Sanders did rely upon the advice of counsel in making such decision, but was not deprived of his right to call Mrs. Yancey.  Mr. Sanders did not insist upon the calling of Mrs. Yancey nor did he voice any objection to counsel's advice as to whether or not the alibi witness should be called." (Knizley Aff., Doc. 540-2, at 2.)  Mr. Morgan confirms that the decision not to call Yancey was strategic, stating:  "I did not choose to call Toni Yancey

for the reason that I did not believe that the jury would believe her.  Based upon that I thought it was best that we not call Ms. Yancey."  (Morgan Aff., Doc. 541,¶ 3.)  While Mr. Morgan agrees with Sanders' assertion that he refused to call Ms. Yancey, he modifies that statement by saying that "I advised and persuaded him, that I thought it was in his best interest that we not call Ms. Yancey."  (*Id.* ¶ 4.)

During the murder investigation, Ms. Yancey was twice called to testify under oath as part of the investigation into Gibson's murder.  At the time Yancey gave a sworn statement to the prosecuting attorney in Michigan, she was represented by Mr. Morgan. (Doc. 521-2.)  When questioned about Sanders whereabout during the time of the murder, Yancey exercised her Fifth Amendment privilege against self-incrimination.  (*Id.* at 5.)  Ms. Yancey was also invoked the Fifth Amendment when called to testify before a grand jury in this district.  (Tr. 1307.)

### Stipulations at Trial

At the murder trial, the defense entered into two stipulations with the government.  The first was about defense counsel's receipt of Gibson's statement prior to the April 1999 jury selection date.  That stipulation was presented to the jury as follows:

Ms. Bedwell: Counsel has agreed to stipulate that the statement provided to Agent Mixon by Mr.  Gibson was provided to counsel for Mr. Sanders on February 22nd of 1999.

Mr. Knizley: Judge, that correspondence was sent reflecting that the corresponded – that statement was with the correspondence.

Ms. Bedwell: Correct.

The Court: And a stipulation, ladies and gentlemen, is an agreement that the parties have reached without any admission of guilt involved.  It's just an admission that this fact that was just related to you is a fact that you can consider in evidence without the necessity of a witness having to testify to it.

(Tr. 777.)

The parties also entered into a second stipulation regarding Sanders' knowledge of his potential sentence for the 1996 drug conspiracy charges. The defense and the government agreed that Sanders had been informed by the United States Probation Office in November 1998 "that the potential Federal sentencing guideline range he faced in the drug charges pending against him here was from [168] months to [188] months to [235] months." (Tr. 777-78.)

## PROCEDURAL BACKGROUND

### Direct Appeal

Sanders appealed his conviction and was represented on appeal by court-appointed counsel, Arthur Madden. Sanders raised three issues on appeal: (1) exclusion of expert testimony on eyewitness identification; (2) denial of defendant's motion to suppress out-of-court identification; and (3) double jeopardy with respect to substantive drug offense convictions. None of these claims were successful, and Sanders' conviction was affirmed in an unpublished opinion dated May 13, 2002. A petition for writ of certiorari was denied by the United States Supreme Court on January 21, 2003.

### Section 2255 Motion

A motion for § 2255 relief was filed on January 20, 2004. The motion, which was filed on petitioner's behalf by attorneys David Steingold and Tracie Dominique Palmer, raises four claims:

> A. Ineffective assistance of counsel due to failure to call Toni Yancey as an alibi witness;
> B. Ineffective assistance of counsel due to the stipulation regarding counsel's receipt of Gibson's statement:

C.  Ineffective assistance of counsel due to a conflict of interest that arose during trial; and

D. The cumulative effect of counsel's multiple errors denied petitioner due process and a fair trial.

The United States filed its response to motion on March 3, 2004.

**Motion for Leave to Amend**

While the original § 2255 motion was still pending, a motion for leave to amend was filed on Sanders' behalf by new counsel.  On May 3, 2006, attorneys Dwight Thomas and Jason Sheffield filed an amended motion raising two additional ineffective assistance of counsel claims.  The amended motion asserts, first, that counsel failed to call a disinterested eyewitness to contradict the testimony of the government's eyewitness and, second, that counsel failed to introduce testimony from the defense investigator to dispute the government's ballistics evidence.  The government objects to the motion to amend on the ground that the claims asserted in the motion are time-barred and do not relate back to the claims asserted in the original petition.

## LEGAL ANALYSIS

In order to determine whether petitioner is entitled to relief, the Court must first decide which claims are properly before it.  Therefore, the first issue to be addressed is the motion for leave to amend.  The government argues that it should be denied because the claims asserted in the amended motion are time barred.  For reasons stated below, the Court agrees with the government on that issue.  Therefore, the only claims to be addressed on the merits are the ineffective assistance of counsel claims raised in the original motion.  Applying the well-settled law regarding ineffective assistance of counsel, the Court concludes that the petitioner is not entitled to relief on any of those claims.

9

**The Amended Motion is Time Barred**

The motion for leave to amend was filed more than one year after Sanders' conviction and sentence became final.[10]  In 1996, Congress imposed a one-year limitations period section 2255 claims. *See* 28 U.S.C. § 2255. Hence, claims filed or added more than one year after the conviction became final are time-barred unless they "relate back" to timely-filed claims. *Davenport v. United States*, 217 F.3d 1341 (11th Cir. 2000).  Relation back principles arising under Fed. R. Civ. P. 15(c) are applied, and claims relate back only if they arise out of the same conduct, transaction or occurrence set forth in the original pleading.  *Id.* at 1344.   The conduct or occurrence must be similar "both in time and type" in order for relation back to apply. It is not enough that both sets of claims arose from the same trial or sentencing.  *Id.*  Nor is it enough that both allege the same general type of claim, such as ineffective assistance of counsel.  *See, e.g.,id.* (no relation back where original claim asserted ineffective assistance for failure to object to drug quantity based on method used to weigh drugs and amended claim asserted ineffective assistance of counsel for failing to object to drug amount based on separate course of conduct).

The only similarity between petitioner's original and amended claims is that they all fall under the broad heading of ineffective assistance of counsel.  As the *Davenport* court made clear, this is not enough to satisfy Rule 15(c).  Nothing in the original ineffective assistance claims–failure to call an alibi witness, entering into a stipulation or conflict of interest–can be considered similar to claims that counsel failed to call a favorable eyewitness or failed to present favorable ballistics evidence.  Thus, plaintiff's amended § 2255 motion does not relate back and

---

[10]Petitioner's conviction became final on January 23, 2001, when the United States Supreme Court denied certiorari. (Doc. 511, Ex. A.) The amended motion was filed almost three years later--January 20, 2004.

is due to be dismissed as untimely.

**Section 2255 Standard of Review**

Habeas relief is an extraordinary remedy which "may not do service for a [ ] [direct] appeal." *United States v. Frady*, 456 U.S. 152, 165 (1982). A defendant who has waived or exhausted his right to appeal is presumed to stand "fairly and finally convicted." *Id*. at 164. Unless a claim alleges a lack of jurisdiction or constitutional error, the scope of collateral attack has remained extremely limited. *Addonizio v. United States*, 442 U.S. 178, 185 (1979). In general, claims not raised on direct appeal may not be considered on collateral attack. A petitioner can, however, overcome his procedural default of claims not raised on direct appeal. The burden a petitioner must meet differs, depending upon the type of claim he raises. First, "nonconstitutional claims can be raised on collateral review only when the alleged error constitutes a fundamental defect which inherently results in the miscarriage of justice or an omission inconsistent with the rudimentary demands of fair procedure." *Burke v. United States*, 152 F.3d 1329, 1331 (11th Cir. 1998) (citations and internal quotations omitted). A petitioner's burden with regard to constitutional claims not presented on direct appeal is slightly less stringent. Constitutional claims may be considered if the petitioner can "show cause excusing his failure to raise the issues previously and actual prejudice resulting from the errors." *Cross v. United States*, 893 F.2d 1287, 1289 (11th Cir. 1990). One way a petitioner may overcome a procedural default of claims not raised on direct appeal, and the path that petitioner has undertaken here, is by attributing the failure to raise those claims to constitutionally ineffective assistance of counsel. *Cross*, 893 F.2d at 1290.

To establish that counsel's performance was so deficient as to violate petitioner's right to

counsel guaranteed by the Sixth Amendment, petitioner "must show both incompetence and prejudice: (1) [P]etitioner must show that counsel's representation fell below an objective standard of reasonableness, and (2) [P]etitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Chandler v. United States*, 218 F.3d 1305, 1312-13  (11th Cir. 2000) (en banc) (internal quotations and citations omitted).

Evaluation of the first prong of an ineffective assistance claim, the reasonableness of counsel's performance, is guided by the principles set forth by the Eleventh Circuit in *Chandler*. First, the standard is *reasonableness* under the prevailing norms of the legal profession.  *Id.* at 1313.  The question is not whether counsel did what was possible, or even what was prudent but whether he did what was "constitutionally compelled."  *Id*.  The burden of persuasion is on the petitioner to prove by a preponderance of competent evidence that counsel's performance was unreasonable.  *Id.*  Review of counsel's performance must be highly deferential, and there is a "strong presumption" of reasonableness.  *Id.* at 1314.  That presumption is even stronger if petitioner was represented by experienced trial counsel.  *Id.* at 1315.  Nothing looks the same in hindsight; therefore, the Court must evaluate the reasonableness of counsel's performance from counsel's perspective at trial.  *Id.* at 1316.  No absolute rules dictate what is reasonable.  *Id.* at 1317.  Hence, counsel has no absolute duty to investigate particular facts or a certain line of defense.  *Id.*

Even when an attorney is shown to have performed unreasonably in his representation of a defendant, it is just as likely as not that his error was harmless.  *Johnson v. Alabama*, 256 F.3d 1156, 1177 (11th Cir. 2001).  Therefore, a petitioner has a difficult burden to prove the prejudice

prong of his ineffective assistance of counsel claims.  *Id.*  As noted, prejudice requires proof that "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id*. (quoting *Strickland v. Washington,* 466 U.S. at 694). A "reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceedings.'" *Id.*   It is not enough to show that the error had "some conceivable effect;" rather, the error must be so egregious as to render the trial unfair and the verdict suspect.  *Id.* "[C]ounsel's conduct [must have] so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  *Strickland* 466 U.S. at 686.

### Claim A: Counsel's Failure to Call Toni Yancey as an Alibi Witness

Initially, the facts underlying this claim were somewhat obscure.  Petitioner supported his claim with his own affidavit, along with the affidavit of attorney Morgan.  Both stated that defense counsel had "refused" to call Ms. Yancey as an alibi witness at trial, but neither provided any explanation or context for the alleged refusal.[11]  Pursuant to Rule 8 of the Rules Governing Section 2255 Proceedings, the Court ordered the record expanded.  Petitioner was required to provide an affidavit from Mr. Morgan explaining the reasons for his refusal to call Ms. Yancey as a witness.  Also, the government was ordered to provide an affidavit from co-counsel Dennis Knizley regarding the defense's failure to call Ms. Yancey as a witness.

Mr. Morgan gives the following  explanation of the decision not to call Ms. Yancey to testify:

---

[11]Regarding counsel's failure to call Ms. Yancey, Sanders, in his affidavit, states to that he "demanded that both of my defense attorneys call Ms. Toni Yancey as my alibi witness at trial" and that "[b]oth of my defense attorneys refused to call [her]."

[ ]I did not choose to call Toni Yancey for the reason that I did not
believe that the jury would believe her.  Based upon that I thought
it best that we not call Ms. Yancey. . .  I refused to call Ms.
Yancey.  Although[ ] it is my memory that Mr. Sanders wanted me
to call Ms. Yancey, but I advised and persuaded him that I thought
it was in his best interest that we not call Ms. Yancey.

(Morgan Aff. II, Doc. 541, ¶¶ 3-4.)

In his affidavit, Mr. Knizley has provided a similar, but more detailed explanation for the

decision not to call Ms.Yancey:

I did not fail or refuse to call Toni Yancey to testify at the trial of
the case.  A decision was made collectively by the defendant, Marcus
Sanders, myself, and co counsel Richard Morgan that it would not be in
the best interest of Mr. Sanders to call Mrs. Yancey to testify at the trial of
the case.  A decision was made collectively by the defendant, Marcus
Sanders, myself and coccounsel Richard Morgan that it would not be in
the best interest of Mr. Sanders to call Mrs. Yancey as a witness. . . . [I]t is
my recollection that because of the content of Mrs. Yancey's alibi
testimony, other matters which may be raised on cross examination if Mrs.
Yancey was called to testify, and the fact of her natural bias for the
defendant, what benefit may [have] be[en] from calling Mrs. Yancey as a
witness was outweighed by possible detriment.  There was no
confirmation or corroboration of  Mrs. Yancey's testimony that the
defendant was with her at or about the time of the shooting.  It is my
recollection her testimony would have been they were at the mall, and no
other witnesses nor any other documentary evidence would be able to
support her contention.
     The defense further considered the questionable
identification of Mr. Sanders by an eye witness a photo spread
appeared suggestive, there was a highly questionable identification
by a witness at the scene. . .  It was decided that the eye witness
was impeachable and the risk of calling the alibi witness was too
great considering the lack of corroboration.
     Collectively, a decision was made not to call Mrs. Yancey.
Mr. Sanders did rely upon advice of counsel in making such
decision, but was not deprived of his right to call Mrs. Yancey.
Mr. Sanders did not insist upon the calling of Mrs. Yancey nor did
he voice any objection to counsel's advice as to whether or not the
alibi witness should be called.

(Knizley Aff., Doc. 540-2, at 1-2.)

Taking all of this evidence together–and considering it in the light most favorable to petitioner–Sanders' counsel's performance was not unreasonable.  While counsel did, indeed, refuse to call Ms. Yancey, they also persuaded Sanders that their refusal was in the best interest of the defense.  Moreover, counsel's position was an informed one.  Mr. Morgan had represented Ms. Yancey when she refused to testify during the investigation.  From the notice–and amended notice--of alibi defense filed by counsel, it is evident that the defense was aware of the substance of Ms. Yancey's proposed testimony.  The defense strategy was to rely on reasonable doubt by attacking the strength of the government's  identification evidence.   Counsel evaluated Yancey's proposed testimony and concluded that she would not be a good witness and that her testimony, if disbelieved by the jury, might detract from the reasonable doubt defense.  In sum, counsel employed informed, well-reasoned strategic advice to persuade their client that his defense would not benefit from the uncorroborated testimony of his girlfriend.

Keeping in mind the strong presumption of reasonableness afforded counsel in this Circuit, the Court is not persuaded that counsel's failure to call Ms. Yancey to testify was unreasonable.  Petitioner cites several cases for the proposition that trial counsel's failure to call an alibi witness amounts to unreasonable performance under *Strickland*.  However, none of these cases adhere to a rule that such failure is presumptively unreasonable; rather, the unreasonableness of counsel's actions is a fact-specific inquiry.  In each case, trial counsel either failed to investigate an alibi defense or had no strategic reason for failing to call a known alibi witness.  For example in *Alcala v. Woodford*, 334 F.3d 862 (9th Cir. 2003), called several witnesses who provided general alibi testimony but failed to call the one alibi witness who could provide specific testimony as to date and time.  Since counsel had no strategic reason for

omitting this witness, his performance was found to be unreasonable.

In *Bruce v. United States*, 256 F.3d 592, 597 (7th Cir. 2001), the question was whether counsel had adequately *investigated* a potential alibi witness.  While the *Bruce* court found the record inadequately developed to decide that issue, it did note that "'[s]trategic decisions made after thorough investigation are virtually unchallengable.'" *Id.* (quoting *Strickland*, 466 U.S. 690-91.)  Likewise, failure to investigate was the issue the Eleventh Circuit addressed in *Code v. Montgomery*, 799 F.2d 1481 (11th Cir. 1986):

> The adequacy of a pretrial investigation turns on the complexity of the case and trial strategy.. Here there was only one strategy: an alibi defense. By not inquiring as to Code's whereabouts on the day of the robbery, Stacy's investigation was inadequate.
>
> Under these circumstances we conclude that a competent attorney relying on an alibi defense would have asked Code's mother if she could corroborate the alibi; would have subpoenaed a reluctant witness whom he thought could provide an alibi and would have asked either the witness or the defendant if there were other alibi witnesses.  Moreover, a reasonably effective attorney would have broadened his investigation once Mrs. Code indicated she was unavailable to testify. Even if Mrs. Code had appeared, Stacy had not investigated to the point where he would have discovered that she was not an alibi witness.

*Id.* 1483-84 (footnote and internal citations  omitted).

This is not a case like *Code* or *Bruce* involving counsel's failure to discover an alibi witness who could have been found with reasonable investigation.  Counsel knew both the witness and the substance of her testimony.  Nor was the failure to call Ms. Yancey the result of counsel's negligence, as was the case in *Alcala*.  Instead, it was an informed, strategic decision–the type of decision that *Strickland* said is "virtually unchallengeable."  *Strickland*, 466

U.S. at 691.[12]  Consequently, the Court finds that the petitioner cannot satisfy *Strickland's* performance prong.

### Claim B:  Counsel Rendered Ineffective Assistance by Agreeing to a Stipulation

At trial, defense counsel and the United States Attorney entered into a stipulation that Sonny Gibson's statement to law enforcement had been provided to the defendant's counsel on February 22, 1999, which was approximately eight weeks prior to Gibson's murder.  Petitioner argues that counsel's agreement to this stipulation amounted to ineffective assistance of counsel because it was, effectively, a concession of an essential element of each of the murder charges against him.

The logic of this argument is as follows.  To prove the murder charges set forth in the indictment, the government had to convince the jury that Sanders knew Gibson was cooperating with the government.[13]  The stipulation was an admission by defense counsel that Sanders knew

---

[12]Citing *Luna v. Cambra*, 306 F.3d 954, *opinion amended* 306 F.3d 954 (9th Cir. 2002). petitioner argues that it is not a legitimate trial strategy to refuse to call an alibi witness simply because that witness is a relative of the defendant.  In *Luna*, however, the only issue addressed was prejudice.  The district court had concluded that counsel's failure to call petitioner's mother and sister as witnesses was not prejudicial, in part, because the jury would be less likely to believe family members who were obviously biased.  The Ninth Circuit reversed, holding that the "simple fact that [they] were family members did not render counsel's failure to investigate and present the corroboration of Luna's alibi harmless."  *Id.* at 962. Even if petitioner could properly cite *Luna* in support of his claim that refusing to call an alibi witness because of her relationship to the defendant is unreasonable, that does not accurately reflect the facts of this case.  Counsel did not think the jury would believe her and they thought that her testimony would detract from the stronger aspect of their defense, *i.e.*, the weakness of the government's identification evidence.

[13]Count Five charged that Sanders killed Gibson to prevent his attendance or testimony at an official proceeding in violation of 18 U.S.C. § 1512(a)(1)(A).  Count Six charged that Sanders killed Gibson in retaliation for providing information to a law enforcement officer relating to the commission of a federal offense in violation of 18 U.S.C. § 1513(a)(1)(B).

that Gibson was cooperating with the government.  Since counsel admitted this knowledge, counsel admitted to an essential element of the offense.  Therefore, according to petitioner, counsel's performance was unreasonable and prejudicial.

Petitioner's argument contains several flaws.  The first, and most obvious, is that it is unsupported by the evidence.  The stipulation contained no admission about Sanders' knowledge; it merely stated that the government provided Gibson's statement to defense counsel on February 22, 1999.  As the Court instructed the jury at the time, this stipulation was *not* an admission of guilt but an agreement that this fact–that counsel received Gibson's statement on February 22, 1999--could be considered by the jury without any witness having to testify. Perhaps recognizing the lack of factual support for his argument, petitioner has a backup argument.  He contends that counsel rendered ineffective assistance simply because they agreed to the stipulation.  Counsel's performance was unreasonable, according to petitioner, because the government used that stipulation to support its argument that Sanders knew of Gibson's statement and upcoming testimony.  Counsel did not perform unreasonably, however, by stipulating to a fact that easily could have been proven. Whether counsel's receipt of Gibson's statement was proved through a witness or by stipulation, it is still an undisputed fact.

As part of the same ineffective assistance claim, petitioner also argues that counsel was unreasonable for failing to clarify the stipulation and for failing to object to the government's "improper interpretation" of the stipulation in its closing argument.  The stipulation was perfectly clear; if any clarity is lacking in hindsight, it is solely the result of petitioner's deliberate obfuscation.  To demonstrate that the government relied on the stipulation to make an improper argument, petitioner provides a quote from the prosecutor's closing argument but omits

18

a crucial portion.

        In closing, the United States Attorney argued:

        The stipulation has been this man knew.  He had been told by pretrial
    services down here that at his drug trial if he was convicted on April the 19th,
    when it was scheduled to start in 1999, last year, if he was convicted he was
    looking at a hundred and eighty-eight to two hundred and thirty-five months in
    jail.  That calculates to about – between fifteen and nineteen years.  A little over
    fifteen, a little over nineteen years in jail.  That's a long time.
        What's the first thing you would ask if you were trying to solve a crime?
    What's the motive?  Why would any body want to kill Sonny Gibson?  Why
    would anybody want to kill this man?  The answer is clear.  He was going to be a
    witness in a trial down here in two days against this man, who knew that he had
    given a statement to law enforcement.  He knew this back in February of 1999.
        He called the daughter, he shouldn't testify, it will be all right, trying to
    get her to get him not to testify.  Why?  He didn't like what he way in the
    statement.  He didn't like fifteen to nineteen years in jail.

(Tr. 1031-32.)  It is clear that the first paragraph quoted above refers to a second stipulation, that

is, that Sanders knew the amount of prison time he was facing if convicted on the drug charges.

        Petitioner, however, quotes only the first sentence of the first paragraph: "The stipulation

is that this man knew," and omits the remainder of the paragraph.  By doing so, petitioner

attempts to connect the first sentence of the first paragraph–"The stipulation is this man knew"--

to the fifth sentence of the second paragraph–"that [Gibson] had given a statement to law

enforcement."  Consequently, petitioner's claim that the prosecutor made an improper argument

is based on nothing more than manipulative editing and an artful connection of disconnected

statements.  Because the record clearly demonstrates that no improper argument occurred, [14]

_____

        [14]The government presented ample evidence to support its argument that Sanders knew,
prior to Gibson's murder, about Gibson's statement and his status as a government witness.
Gibson's daughter testified that Sanders told her in a telephone conversation that he had read her
father's statement and that her father should not testify.  Sanders was present at jury selection
when Gibson's name was read as a potential government witness.  Also, Sanders discussed with
Braulio Darius that Gibson was scheduled to testify.

counsel's failure to object was neither unreasonable nor prejudicial.

### Claim C: Counsel Rendered Ineffective Assistance by Continuing to Represent Petitioner After Counsel Became a Fact Witness

According to petitioner, trial counsel should have known that the stipulation regarding Gibson's statement would be used by the government to argue that Sanders was aware of the statement.  Sanders now asserts that he never saw Gibson's statement prior to the murder, and his attorneys were the only witnesses who could testify to that fact.  Therefore, Sanders contends that "[o]nce the Government made the improper implications from the stipulation, both counsel for defendant effectively became fact witnesses for the defense because neither counsel actually provided Gibson's statement to Mr. Sanders. . .  This produced a conflict of interest for both counsel[ ] and required their disqualification at that point in the trial."  (Petr's Brf., Doc. 511, at 17-18.)   As with petitioner's previous claim, this argument fails because the prosecutor did not make "improper implications."  Furthermore, petitioner's knowledge of Gibson's statement was a crucial element of only *one* of the two murder charges against him, *i.e.* murder in retaliation for providing information to a law enforcement officer.  Consequently, petitioner's conflict of interest claim does not address his conviction for murdering a federal witness. Finally, even if the prosecutor had invited the jury to draw an improper inference from the stipulation, that invitation did not occur until closing argument.  At that point, it was too late for defense counsel to be a fact witness.

In sum, counsel did not perform unreasonably in failing to anticipate or object to the government's impermissible use of the stipulation regarding Gibson's statement because there was no impermissible use.  Furthermore, petitioner suffered no prejudice because the alleged error did not affect his conviction for murder of a federal witness.

**Claim D:  Cumulative Effect of Counsel's Errors**

Petitioner asserts that even if the errors alleged in Claims A, B and C are not considered to be prejudicial individually, the cumulative effect of those errors is prejudicial and violated his right to due process and a fair trial. In the absence of any error, however, there can be no cumulative error.  *United States v. Hall*, 455 F.3d 508, 520 (5th Cir. 2006), *cert. denied*, 127 S.Ct. 2029 (2007).  Since this Court has found no error in counsel's performance, petitioner's cumulative error claim also fails.

CONCLUSION

For the foregoing reasons, the Court finds that the claims asserted in petitioner original § 2255 are without merit.  The Court further finds that the claims asserted in the amended § 2255 motion are barred by § 2255's one-year limitations period and do not relate back to the claims asserted in the original motion.  Thus, both the motion to vacate, set aside or correct sentence and amended motion to vacate, set aside or correct sentence are **DENIED**.

**DONE** and **ORDERED** this the 4th  day of December, 2007.


*s/Charles R. Butler, Jr.*
**Senior United States District Judge**